**Aaron D. McDONALD, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 20A03–0605–CR–229.**

Court of Appeals of Indiana.

Feb. 28, 2007.

Nancy A. McCaslin, McCaslin & McCaslin, Elkhart, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Chief Judge.

Aaron D. McDonald ("McDonald") appeals the sentence he received following his guilty plea to murder,[1] conspiracy to commit murder,[2] a Class A felony, and criminal confinement while armed with a deadly weapon,[3] a Class B felony. McDonald raises three issues, which we restate as:

I.  Whether the trial court abused its discretion in the manner in which it considered and applied aggravators and mitigators during sentencing.

II. Whether McDonald's sentence is appropriate based on the nature of the offense and the character of the offender.

III. Whether the trial judge committed fundamental error when he did not recuse at sentencing because he knew two of the State's witnesses on a professional basis.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On August 4, 2005, McDonald along with his friend, Hanna Stone ("Stone"),[4] and

---

1.  See IC 35–42–1–1.

2.  See IC 35–41–5–2.

3.  See IC 35–42–3–3(b).

4.  See Stone v. State, 859 N.E.2d 392 (Ind.Ct. App., 2006).

Stone's boyfriend, Spenser Krempetz ("Krempetz"), were smoking marijuana at McDonald's residence. At that time, Stone suggested to Krempetz and McDonald that they kill Stone's mother, Keim, because she opposed Stone's relationship with Krempetz. Stone offered to pay McDonald $400.00, and McDonald initially refused but later agreed. McDonald then obtained a gun from a friend. Under their plan, Stone would knock on Keim's door, at which time Krempetz would run in and tackle her. Then McDonald would enter with the gun.

The three left McDonald's residence and executed the plan. Stone knocked on the door, and when Keim answered, Kremptez tackled her back into the apartment. Keim screamed a few times until Krempetz, with the help of McDonald, taped her eyes and mouth closed and bound her hands. Krempetz removed the tape from Keim's mouth to ask her how much money she had in the bank, where her ATM card was located, and what the PIN number was. McDonald and Krempetz then took Keim to the bank while Stone stayed behind just in case someone had called the police when Keim screamed. At the bank, McDonald left the vehicle to get money while Krempetz stayed behind and watched Keim. McDonald returned with $200.00 and gave it to Krempetz, who later gave $100.00 back to McDonald.

The two then drove Keim around for some time in Elkhart and Kosciusko County. Eventually, Krempetz pulled the vehicle to the side of the road next to a cornfield. Krempetz asked McDonald for the gun. Krempetz then took Keim out of the car and walked toward the cornfield with one hand holding her bound hands and the other pressing the gun against her back. McDonald followed them into the cornfield until Krempetz ordered Keim to her knees and directed her to pray. At that time,

McDonald turned around and headed back to the vehicle. After McDonald heard Krempetz ask Keim if she said "Amen," he heard a gunshot.

Krempetz returned to the vehicle, and the two left the cornfield. While driving, Krempetz boasted about "how good it felt to take someone's soul" and how he was going to have sex with Stone in Keim's bed that night. *Tr.* at 45. McDonald and Krempetz went to a gas station and then to a "drug house" to buy some marijuana. *Id.* at 46. After stopping at another gas station, they returned to Keim's apartment. Stone was still in the apartment when they returned. Upon their arrival, Stone looked at Krempetz and said to him, "Don't you realize you got blood on your face." *Id.* at 47. Stone also said laughingly, "Yeah ... I loved my mother to death." *Id.* The three sat around and smoked some more marijuana. Thereafter, McDonald left and returned the borrowed gun just before he went home and went to sleep.

The next morning, Stone and Krempetz came by to see if McDonald wanted to leave town with them. McDonald declined and instead went back to Keim's apartment and stole one of Keim's checks. McDonald made the check out to himself for $800.00 and then cashed it. Eventually, after Keim was reported missing, the police questioned McDonald about the stolen check. McDonald initially denied that it was stolen and claimed he received the check for various duties he performed for Keim. He was released, but the police returned to question McDonald further. At that time, McDonald told the police the whole story and took them to Keim's body.

The State charged McDonald with murder, Class A felony conspiracy to commit murder, and Class B felony criminal confinement. Under a plea agreement in which his sentences would run concurrently, McDonald pled guilty to all counts. At

McDonald's sentencing, the trial court disclosed to both attorneys that he had a professional relationship with two of the State's witnesses and asked if either had an objection. Neither the prosecutor nor McDonald's counsel had any objection. *Tr.* at 70–71.

After the witnesses were heard, the trial court found the following aggravators: (1) there are multiple cases involving McDonald and these crimes; (2) McDonald committed this crime solely for financial gain, and he returned to Keim's apartment after she was deceased to procure a check for an additional $800.00; (3) as a minimal aggravating circumstance, McDonald had six juvenile criminal arrests, although not all resulted in a delinquency adjudication; (4) McDonald smoked marijuana since he was six or seven years old, used cocaine and marijuana around the time these offenses were committed, and handled a loaded firearm while under the influence of drugs; (5) McDonald participated in the conspiracy to commit murder and the victim was the same person as planned in the conspiracy; and (6) by his own account, McDonald considered himself a victim of this incident. *Appellant's App.* at 39–40. The trial court also found the following mitigators: (1) McDonald was a minor (seventeen) at the time of the incident; (2) McDonald cooperated with the State in recovering the body of the victim; (3) McDonald suffered from drug and alcohol addictions; and (4) McDonald expressed remorse which was tempered by his claim of being a victim. *Id.* at 40–41. The trial court found that the aggravators outweighed the mitigators and enhanced his murder sentence from the advisory fifty-five years to sixty-two years while imposing the advisory sentences for the remaining convictions, and ran all sentences concurrently. McDonald now appeals.

## DISCUSSION AND DECISION

### I. Enhanced Sentence

■ McDonald claims that the trial court used improper aggravators in determining his sentence. Sentencing determinations are within the discretion of the trial court. *Fuller v. State,* 852 N.E.2d 22, 26 (Ind.Ct.App.2006), *trans. denied.*

Currently, this court is divided on whether it is required to review aggravators and mitigators found or not found by the trial court. *See Gibson v. State,* 856 N.E.2d 142, 146–47 (Ind.Ct.App.2006). Pursuant to recent amendments of the sentencing statutes, a trial court may impose any sentence authorized by statute and permissible under the Constitution of the State of Indiana "regardless of the presence or absence of aggravating circumstances or mitigating circumstances." *Id.* at 146 (citing IC 35–38–1–7.1(d)). However, IC 35–38–1–3(3) still requires that, "the court . . . make a record of the hearing, including . . . *if* the court finds aggravating and mitigating circumstances, a statement of the court's reasons for selecting the sentence that it imposes." (Emphasis added).

*Windhorst v. State,* 858 N.E.2d 676 (Ind. Ct.App.2006), *trans. granted* exemplifies the division in reviewing an enhanced sentence. Two members of the panel disagreed with *McMahon v. State,* 856 N.E.2d 743 (Ind.Ct.App.2006) which held that a trial court must still explain a deviation from the presumptive/advisory sentence, and held that the legislature's 2005 amendments to Indiana's sentencing statutes, including the language in IC 35–38–1–7.1 referenced above, eliminated a sentencing statement requirement or any reference to aggravators or mitigators as the solution to the Sixth Amendment sentencing problems discussed in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *Smylie v. State,* 823

N.E.2d 679 (Ind.2005). *Windhorst*, 858 N.E.2d at 678 n. 2. The third member of the *Windhorst* panel defended the *McMahon* decision and maintained that there is a distinction between the requirement of judicial fact-finding of aggravators and mitigators required by *Blakely* and *Smylie* and the requirement of a sentencing statement when the trial court deviates from the presumptive/advisory sentence. *Id.* at 680–81. This distinction preserves the sentencing statement requirement whenever a trial court imposes something other than the advisory sentence. *Id.* at 681. The purpose is "to guard against arbitrary sentences and to provide an adequate basis for appellate review." *Id.*

■ We follow the lead of the *Windhorst* majority and conclude that a challenge to the trial court's sentencing statement presents no issue for appellate review. We await our Supreme Court's guidance on whether a defendant may appeal a trial court's finding of aggravators and mitigators for a sentence within the statutory range, and until then, we will assume it unnecessary to assess the trial court's findings.[5]

## II. Ind. Appellate Rule 7(B) Review

■ McDonald asserts that his sentence should be revised based on the nature of the offense and his character. This court may revise a sentence after careful review of the trial court's decision if it concludes that the sentence is inappropriate based on the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). Even if the trial court followed the appropriate procedure in arriving at its sentence, this court still maintains a constitutional power to revise a sentence it finds inappropriate. *Hope v.*

State, 834 N.E.2d 713, 718 (Ind.Ct.App. 2005).

McDonald cites to *Walton v. State*, 650 N.E.2d 1134 (Ind.1995) and *Widener v. State*, 659 N.E.2d 529 (Ind.1995) to support his contention that an offender's youthful age is a consideration for reducing a sentence. Because he was only seventeen years old, McDonald argues that his sentence deserves similar revision. In *Walton*, our Supreme Court reduced a mentally ill sixteen-year-old's sentence from one hundred and twenty years to eighty years for the murder of his two adoptive parents because the trial court inappropriately found a single aggravator. 650 N.E.2d at 1137. In *Widener*, the Supreme Court reduced a seventeen-year-old's seventy-year sentence to fifty years for felony murder and conspiracy to commit robbery because the trial court inappropriately found an aggravator and did not consider any of the significant mitigating circumstances. 659 N.E.2d at 533–34.

Here, McDonald's sentence deserves no revision. We examine the nature of the offense and character of the offender. McDonald committed the offense of murder, conspiracy to commit murder, and criminal confinement with a deadly weapon, all for $400.00. He supplied the deadly weapon and confined Keim with it. He helped transport and continuously confined Keim from her home to her bank to her place of execution. He even returned to Keim's apartment the day after she was killed to steal a check and profit further from the crimes. Despite all that, McDonald claimed to be a victim. While McDonald may have helped the police discover the body, he did so only after first lying to the police about the whole event. Although he

---

5. For more discussion on this court's division in analyzing mitigating and aggravating circumstances *see* Joel Schumm, *More division on the sentencing front: 2005 sentencing amendments,* Vol. 50, No. 4 Res Gestae 33 (November 2006).

helped the State by pleading guilty, McDonald received significant benefits from a plea agreement that limited his total sentence to sixty-five years out of a possible one hundred and forty years. McDonald's sixty-two year sentence was not inappropriate based on the nature of the offense and the character of the offender.

### III. Recusal

■ Finally, McDonald asserts that the trial judge committed fundamental error by not recusing from McDonald's sentencing. Specifically, McDonald claims the trial judge's previous professional contact with two of the State's witnesses created partiality during the sentencing hearing that warranted his disqualification, even though McDonald's trial counsel affirmatively stated that it would not make a difference. *Tr.* at 70–71. In response, the State asserts that McDonald's failure to object acted as tacit approval of the trial judge's presence, which invited any error that may exist. Further, the State argues that the trial judge's professional acquaintance with the two State witnesses was not enough for this court to find fundamental error.

■ The law presumes that a judge will be unbiased regardless of the matter that comes before him. *Carr v. State,* 799 N.E.2d 1096, 1098 (Ind.Ct.App.2003). To rebut that presumption the defendant must establish actual bias or prejudice that places him in jeopardy and makes a fair trial impossible. *Massey v. State,* 803 N.E.2d 1133, 1138–39 (Ind.Ct.App.2004). " 'Timeliness is important on recusal issues.' " *Carr,* 799 N.E.2d at 1098 (quoting *Tyson v. State,* 622 N.E.2d 457, 460 (Ind. 1993)). "A party may not lie in wait" to raise a recusal issue after receiving an adverse decision. *Id.*

■ Here, McDonald has waived the issue by his failure to object at the sentencing hearing. "Waiver notwithstanding," we still review to determine whether there exists fundamental error. *Id.* In order for McDonald to establish fundamental error he must show a blatant violation of basic principles rendering a deprivation of his fundamental due process. *Charlton v. State,* 702 N.E.2d 1045, 1051 (Ind.1998). We find that he failed to do so here. The trial judge knew the two State witnesses from his professional experience in the Elkhart County legal system. Robert Keim, Keim's husband, worked in the Sheriff's Department, and Susan Stuzman, Keim's sister, was a clerk in the courts. The trial judge had no social interaction with either party. While a judge's personal knowledge may warrant disqualification, we cannot say that the judge's knowledge in this case led to a ˙ violation of McDonald's right to due process. As such, the trial judge did not commit fundamental error by not recusing.

Affirmed.

RILEY, J., and FRIEDLANDER, J., concur.